UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| PAUL P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:19 CV 71 JMB |
| | ) | |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Paul P.'s ("Plaintiff") applications for disability insurance benefits under Title II, 42 U.S.C. §§ 401 et seq. and supplemental security income, Title XVI, 42 U.S.C. §§ 1381, et seq. All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

## I.   Procedural History

On July 20, 2016, Plaintiff filed applications for disability benefits, arguing that his disability began on July 26, 2015,[1] as a result of gout, arthritis, partial right elbow replacement,

---

[1] Before the Commissioner, Plaintiff initially claimed a disability onset date of July 26, 2015. While still before the Commissioner, and "upon consultation and through his attorney, [he] amended the alleged onset date … to January 19, 2016."  (Tr. 51, 121, 159)  In his brief before this Court, and without citation to authority, "reinstates his original alleged onset date of disability to July 26, 2015."  (ECF No. 12 at 4)

bilateral and cubital carpal tunnel syndrome, high blood pressure, and right shoulder pain.[2]  (Tr. 197, 269-282)  On February 2, 2017, Plaintiff's claims were denied upon initial consideration.  (Tr. 196-202)  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at the hearing (with counsel) on August 29, 2018, and testified concerning the nature of his disability, his functional limitations, and his past work.  (Tr. 117-57)  The ALJ also heard testimony from Kent Granat, a vocational expert ("VE").  (Tr. 141-52, 399-400)  The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the rest of the evidence of record, the ALJ issued a decision on December 6, 2018, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 48-63)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA").  (Tr. 1-6)  Plaintiff submitted additional medical evidence which

---

[2] Plaintiff did not list obesity as a disabling impairment in his application, his request for reconsideration, his disability reports, or mention obesity at the hearing.  Failure to allege a disabling impairment in an application for disability benefits is a significant factor in determining the severity of an alleged impairment.  See, e.g., Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding fact that claimant did not allege disabling condition in his application is significant, even if evidence of the impairment is later developed); Sullins v. Shala, 25 F.3d 610, 604 (8th Cir. 1994) (finding it "noteworthy that [the claimant] did not allege a disabling mental impairment in her application for disability benefits, nor did she offer such an impairment as a basis for disability at her hearing.") (internal citation omitted).  See also Kliber v. Social Sec. Admin. 794 F.Supp.2d 1026, 1040 (D. Minn. 2011) (citing the failure to allege a condition in disability reports or testify to the condition at the hearing as support for ALJ's conclusion that the condition was not severe).  Nonetheless, the ALJ considered Plaintiff's obesity in assessing Plaintiff's Residual Functional Capacity and rendering her ultimate decision. (Tr. 58-59)

was not before the ALJ when she decided Plaintiff's case on December 6, 2018.[3]   The Appeals Council did not consider the additional medical evidence, finding that it did not relate to the period at issue, July 27, 2015, through December 6, 2018.  On July 18, 2019, the Appeals Council denied review of Plaintiff's claims, making the December 6, 2018, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises two issues.  First, Plaintiff argues that the ALJ failed to consider a closed period of disability.  Second, he argues that the ALJ's Residual Function Capacity ("RFC") determination is not supported by substantial evidence.  The Commissioner filed a detailed brief in opposition.

As explained below, the Court has considered the entire record in this matter.  Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.   Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from August 5, 2014, through November 28, 2018.  The Court has considered the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.   International Eyecare Center – Drs. Kenneth Mueller and Elizabeth Monroe
(Tr. 69-92, 104-08, 722-36)

Between May 1 through September 11, 2018, optometrists Elizabeth Monroe and Kenneth Mueller treated Plaintiff's eye problems.

---

[3] The additional evidence included treatment records from Dr. Robert Jackson dated January 3 through April 24, 2019 (Tr. 16-34, 42-45) and Washington University Ophthalmology dated January 10 through May 6, 2019.  (Tr. 8-15, 35-41)

On May 1, 2018, Plaintiff presented to establish eye care.  Dr. Monroe diagnosed Plaintiff with iridocyclitis, the swelling and irritation of the uvea.  On May 17, 2018, Plaintiff received follow-up treatment.  Dr. Monroe prescribed medication.  Plaintiff reported significant improvement.  During treatment on June 7, 2018, examination of Plaintiff's eyes showed mild symptoms with soreness, and Dr. Monroe restarted his Lotemax prescription.

On June 26, 2018, Plaintiff reported having periods of painful, burning eyes and experiencing light sensitivity.  Dr. Monroe dilated Plaintiff's eyes and opined that Plaintiff's eye dryness was caused by his steroid use.  Examination on July 17, 2018, revealed resolved primary iridocyclitis.  On September 11, 2018, Plaintiff returned for follow-up treatment.

**B.     Hannibal Clinic – Drs. Robert Jackson, Leslie McCoy, and Michael Tentori**
(94-103, 113-16, 503-99, 642-60, 738-47)

Between August 5, 2014, through November 28, 2018, Drs. Robert Jackson, D.O., Leslie McCoy, and Michael Tentori treated Plaintiff's chronic gout,[4] bilateral uveitis, and elevated blood pressure.

On August 5, 2014, Dr. Tentori treated Plaintiff for high blood pressure. Plaintiff reported being off his medications.

In follow-up treatment on August 14, 2014, Dr. Jackson counseled Plaintiff to lose weight. Plaintiff reported having five to six gout attacks a year.  Examination showed some generalized tenderness of Plaintiff's feet without gouty tophi or significant bony deformity.  Dr. Jackson

---

[4] Gout is classified as a type of inflammatory arthritis.  http://www.cdc.gov/baiscs/gout.htm. "Gout is precipitation of monosodium urate crystals into tissue, usually in and around joints, most often causing recurrent acute or chronic arthritis." Id.  "Unlike most types of arthritis, which are chronic, gout is typically episodic, characterized by painful flares lasting days/weeks followed by long periods without symptoms." Id.  Risk factors for gout include cardiovascular disease, diabetes, renal disease, hypertension, obesity, and prior joint injury. Id.

continued Plaintiff's medication.  During treatment on November 6, 2014, Plaintiff reported having bilateral foot pain and ongoing recurrent gout attacks, causing him to miss some work.  Dr. Jackson administered injections on both of Plaintiff's feet and urged him to lose weight, fifteen to twenty pounds and to consider an aquatic exercise program.

On February 12, 2015, Plaintiff reported having a gout flare-up in his right foot despite taking Uloric and prednisone daily.  In follow-up treatment on June 4, 2015, Plaintiff reported intermittent gout attacks.  Dr Jackson continued Plaintiff's medications.  On July 2, 2015, Plaintiff reported his gout being under reasonably good control and starting a new, less physically demanding job.  Plaintiff returned for a recheck on August 20, 2015, and reported having a gout attack which subsided spontaneously with continued use of Uloric.

On September 14, 2015, Plaintiff established care with Dr. McCoy and reported wanting to lose weight and being unable to use his elbow.  Dr. McCoy noted that she could not examine Plaintiff's right arm other than to note his arm was braced.  In follow-up treatment on October 13, 2015, Dr. McCoy noted improvement in Plaintiff's blood pressure and diagnosed Plaintiff with hypertension and continued his medication.

On November 5, 2015, Plaintiff returned to Dr. Jackson for a chronic gout recheck.  Plaintiff reported having a recent mild attack in his great right toe which subsided spontaneously after a few days.  Examination showed mild to moderately edematous in his lower extremities.  Plaintiff reported being on leave from work after having open reduction and internal fixation surgery and wearing a right upper extremity immobilizer.  Dr. Jackson continued Uloric and encouraged Plaintiff to start walking at least thirty minutes each day.  Plaintiff returned on December 30, 2015, and reported having some minor gout attacks in both his feet but the attacks subsided easily with a small dose of prednisone.

An Electromyography and Nerve Conduction Report dated February 3, 2016, showed evidence of right ulnar and median sensorimotor neuropathy.  The next study on May 25, 2016, showed improvement.

On February 25, 2016, Plaintiff returned for a chronic gout recheck and reported his gout being "under good control" and experiencing situational depression.  (Tr. 577)  Dr. Jackson continued Plaintiff's medication regimen.

Plaintiff reported that his blood pressure medicine was working well during treatment with Dr. McCoy on April 12, 2016.

On April 21, 2016, Plaintiff reported having no gout attacks while taking Uloric.  Plaintiff returned on May 26, 2016, for evaluation of his post-traumatic osteoarthritis of his right wrist, elbow, and shoulder, associated with nerve entrapment of his feet.  Dr. Jackson noted that the most recent nerve conduction study showed improvement and his velocities back to normal, and Dr. Colbert's evaluation found that Plaintiff's elbow and wrist would not need any further surgical intervention.  Plaintiff reported not having any gout flare-ups.  Dr. Jackson found his gout to be intercritical.

During treatment on June 7, 2016, Plaintiff reported having disability of his right upper extremity and no recent gout attacks.  Dr. Jackson noted that "[h]is [P]eak performance assessment was completed and revealed there was a virtually a nonfunctioning right upper extremity…. He could not even lift a 4 lb. weight off the floor."  (Tr. 742)  Plaintiff returned on June 28, 2016, and reported not experiencing a gout flare-up.  Dr. Jackson found Plaintiff had refractory chronic gout.  On August 4, 2016, Plaintiff received follow-up for post-traumatic osteoarthritis of his right shoulder and elbow, and Dr. Jackson refilled his Hydrocodone.  Dr. Jackson also provided Plaintiff complimentary samples of Uloric.

6

On September 8, 2016, Plaintiff reported having foot pain and occasional, brief mild gout episodes of his feet.  Dr. Jackson continued his Uloric medication.  During treatment on October 6, 2016, Plaintiff reported no  gout attacks, taking Uloric daily, and wanting to lose weight.  Dr. Jackson found Plaintiff's chronic gout was currently stable.

On November 11, 2016, Dr. McCoy completed a physical examination without any abnormal findings.

Plaintiff returned on November 30, 2016, and reported not having any gout attacks and taking Uloric daily.  On April 10, 2017, Plaintiff returned for a gout recheck.  During treatment on July 20, 2017, Plaintiff reported that his gout was well controlled.  Physical examination showed trace nonpitting edema in his feet and lower legs.  On September 7, 2017, Plaintiff complained of chronic pain in his right wrist, arm, and shoulder.  Examination showed pain with flexion and extension of Plaintiff's right wrist with decreased grip strength on the right side.  Dr. Jackson continued his medication regimen and indicated that he would retry sending Hysingia through insurance company to provide Plaintiff a long-acting pain medication.

Plaintiff returned on November 21, 2017, complaining of a gout episode.  Dr. Mian Rizwan treated Plaintiff for Dr. Jackson.  Dr. Rizwan found Plaintiff had a restricted range of motion in his left foot and that Plaintiff seemed to be having acute gouty arthritis.  During follow-up treatment on December 29, 2017, Plaintiff reported having pain in his right elbow and decreased range of motion.  Plaintiff indicated that his gout had been under control, and stated that "he really only feels it in his left ankle but his feet have been okay."  (Tr. 769)

Plaintiff returned on March 8, 2018, complaining of some mild to moderate episodic gout attacks in his lower extremities.  In a Second Dictation for Dr. Jackson, Dr. Kendra Martin noted that Plaintiff "has had severe reaction to other gout medications in the past and is currently on

Zurampic and high dose Uloric. He  states that he is doing fairly well but had an acute flare about 2-3 weeks ago." (Tr. 767)  On March 22, 2018, Dr. Jackson treated Plaintiff for acute scleritis of his left eye.  Plaintiff reported experiencing some photophobia and tearing of his eye with pain.

Plaintiff returned on May 3, 2018, and denied having a recent gout flare-up. Dr. Jackson found that Plaintiff had developed bilateral uveitis in his left eye, and this diagnosis had been confirmed by Dr. Monroe, an optometrist.  In follow-up treatment on June 7, 2018, Dr. Jackson rechecked Plaintiff's uveitis and noted that Plaintiff's Peak performance functional assessment revealed "virtually a nonfunctioning right upper extremity.  He is right handed.  He could not even lift a 4 lb. weight off the floor."  (Tr. 756)  Dr. Jackson found that Plaintiff had not experienced any recent gout attacks but his uric acid level was elevated.  Plaintiff returned on June 28, 2018, requesting a disability letter.  Dr. Jackson noted that Plaintiff had not experienced a gout flare-up and instructed Plaintiff to continue his gout medications.

During a recheck on September 27, 2018, Plaintiff  reported that "[h]is disability hearing was successful." (Tr. 95)  Examination showed his weight was excessive with a body mass index greater than 46, falling into a high risk of obesity level.  Dr. Jackson found that Plaintiff had generalized tenderness of his ankles and feet but no obvious gouty tophi or swollen growths.  Dr. Jackson prescribed Salagen and Hysingia.  Plaintiff returned on November 28, 2018, complaining of a gout attack and that Uloric resolved the gout attack.

### C.    Hannibal Regional Hospital and Hannibal Regional Medical Group
(Tr. 418-70)

An MRI of Plaintiff's right shoulder showed no evidence of a fracture but fraying of the tendon.

On January 17, 2015, Plaintiff presented in the emergency room complaining of sudden Loss of vision.  The emergency room doctor diagnosed Plaintiff with alcohol intoxication with

transient vision loss.

On July 26, 2015, Plaintiff presented in the emergency room and reported injuring his right elbow and shoulder in a fall at work.  An x-ray showed a subluxed dislocated elbow with radial head fracture.  An CT scan showed a dislocated elbow with chip fractures.

On September 28, 2015, Plaintiff presented at Hannibal Regional Medical Group with a right elbow pain.  Plaintiff reported not progressing in physical therapy due to pain and not taking any medications.  Dr. Luvell Glanton prescribed Nucynta and encouraged Plaintiff to lose weight.

On October 15, 2015, Dr. Glanton performed an open reduction internal fixation on Plaintiff's right shoulder.

**D.**    **Midwest Orthopedic Specialists – Dr. Christopher Bieniek** (Tr.471-90, 748-98)

On July 26, 2015, Dr. Christopher Bieniek repaired Plaintiff's right elbow dislocation by performing open reduction and internal fixation surgery.

On August 11, 2015, Plaintiff presented for follow-up treatment.  Dr. Bieniek explained that Plaintiff would start physical therapy to improve his range of motion.  Dr. Bieniek noted improvement in Plaintiff's range of motion on September 8, 2015, and continued active assisted range of motion through therapy.  On September 29, 2015, Dr. Bieniek found improvement with Plaintiff's range of motion to his elbow and prescribed a turnbuckle splint to improve his extension. Examination on October 20, 2015, showed Plaintiff's elbow arc of motion was improving and significant pain with impingement positions of his right shoulder.  Dr. Bieniek injected Plaintiff's shoulder with lidocaine to diminish his pain.

Plaintiff returned on November 10, 2015, complaining of right shoulder and elbow pain. An MRI showed a healed distal radius fracture and right shoulder rotator cuff tendinitis and bursitis.  Dr. Bieniek noted that he would schedule Plaintiff for right shoulder surgery.  Plaintiff

presented for treatment on December 15, 2015, after having right shoulder surgery.  Dr. Bieniek found Plaintiff had good elbow range of motion and 60% active motion of his right shoulder and indicated that Plaintiff could return to work with no lifting restrictions.  Dr. Bieniek directed Plaintiff to continue his home exercise program.

In follow-up treatment on January 19, 2016, Plaintiff reported hurting his elbow.  An x-ray showed no change of Plaintiff's elbow fractures and evidence of minor arthritic changes.  Dr. Bieniek placed Plaintiff on a ten pound right arm lift limit for one week.  On February 16, 2016, Plaintiff returned complaining of discomfort in his right arm and hand.  Nerve conduction studies showed prolonged sensory nerve action on his right arm.  Dr. Bieniek recommended carpal tunnel release surgery.

On March 22, 2016, Plaintiff received treatment post carpal tunnel release surgery on his right hand.  Dr. Bieniek noted he would continue to keep Plaintiff on light duty activity with a seven pound lifting limit with his right arm.  On April 12, 2016, Dr. Bieniek observed that Plaintiff had no trouble moving his elbow, wrist, and fingers, and his face showed no evidence of any pain but "when [he] examined him and moved him even slightly, he has all those grimacing looks on his face.  It is my opinion that he is exacerbating his symptoms, i.e., symptom magnification." (Tr. 471)  Examination showed excellent range of motion of Plaintiff's right shoulder.  Dr. Bieniek opined that Plaintiff had reached maximum medical improvement, and there was no more treatment he could provide to Plaintiff so he released Plaintiff from his care without any restrictions.

### E.   <u>Mark Twain Behavioral Health</u> (Tr.491-502)

Between March 7 and April 14, 2016, Plaintiff received psychosocial therapy treatment.  Plaintiff reported being angry and resented the hardship placed on his family and finances.

10

Plaintiff indicated that he could not use his right arm very well,  Plaintiff reported he should find out the percentage of disability from Dr. Bieniek so he can settle his case.  During the last session, Plaintiff reported being upset because Dr. Bieniek released him to full duty and found that he could return to work.

      **F.**     **UP – Missouri Orthopaedic Institute – Dr. Matthew Smith** (Tr. 605-41, 661-62)

On May 31, 2016, Dr. Matthew Smith evaluated Plaintiff's right shoulder and elbow. Plaintiff reported that his symptoms had not improved following the carpal and cubital tunnel release surgery in March 2016, and "he was last seen in April 2016 where the physician stated he was prescribed to return to full duty with no restrictions."  (Tr. 630)  Plaintiff indicated that he could not complete his work duties.  Examination of Plaintiff's right shoulder showed diffuse tenderness throughout and significant crepitus with range of motion.  Dr. Smith found that Plaintiff's significant shoulder pain and limited range of motion were attributable to his post traumatic arthritis and ossification formation and recommended replacement of the radial head of his right elbow and a revision of the nerve entrapment.  Dr. Smith explained that Plaintiff's recent EMG demonstrated that his median and ulnar nerves were showing recovery and that he would expect continued improvement over time.

On July 15, 2016, Dr. Smith performed right elbow replacement of radial head and lateral ligament repair surgery.  During a postoperative visit on July 28, 2016, Plaintiff reported doing well and experiencing some pain caused by his splint.  Dr. Smith transitioned Plaintiff to a hinged elbow brace.  On August 25, 2016, Plaintiff reported his pain was decreasing.  Dr. Smith instructed Plaintiff to work on a progressive range of motion and limited him to no significant lifting.  During follow-up treatment on September 22, 2016, Plaintiff reported having some pain but "more sore than pain" and his elbow improving.  (Tr. 610)

On November 3, 2016, Plaintiff reported pain improvement but he had some discomfort if he hit or placed weight on his right elbow.  Dr. Smith observed that Plaintiff had "some unexplained tremor during motion that seems to be voluntary."  Dr. Smith found that Plaintiff was progressing well and slowly working on his range of motion.  Dr. Smith indicated that he would like to have Plaintiff "get to moderate levels of work." (Tr. 635)  On December 29, 2016, Plaintiff reported his range of motion was improving but he could not perform significant lifting, pushing, or pulling.  Examination showed good grip strength but Plaintiff lacked a full range of motion.  Dr. Smith opined that Plaintiff could slowly continue to recover some motion but he should avoid heavy lifting or impact.  Dr. Smith released Plaintiff to work with no heavy lifting or impact restrictions.  In a December 29, 2016, letter, Dr. Smith stated that Plaintiff had been released from care to go back to work with permanent right upper extremity restrictions of no pushing/pulling and a five pound lifting restriction.

III.       **Opinion Evidence**

    A.       **Function Report - Adult** (Tr. 363-70)

Plaintiff reported that his gout limited his walking and standing, and his ability to drive a car.  Plaintiff reported taking his son to after school activities and heling him complete his homework, doing the laundry, and shopping.  Plaintiff indicated that he either walks, drives a car, or rides in a car when he goes outside every day.  Plaintiff reported his right arm injury prevents him from throwing a football or baseball, fishing, hunting, or camping.  Plaintiff indicated that he could walk a half mile so long as he was not having a gout episode.

    B.       **Function Report Adult – Third Party** (Tr. 341-48)

In a Function Report Adult – Third Party, Plaintiff's wife indicated that his normal daily activities included completing a lot of paperwork, making phone calls, doing online research, and

going to doctor's appointments.  She indicated that Plaintiff helped take care of their son by providing rides, helping with homework, preparing simple meals, doing the laundry,  running errands, and caring for the cat.  As his social activities, Ms. P indicated that Plaintiff helped organize a fundraiser and goes to the library.

### C.    **Treating Source Statement - Dr. Robert Jackson** (Tr. 745-47)

In a July 16, 2018, To Whom It May Concern letter, Dr. Jackson opined that although Plaintiff had been undergoing treatment for chronic gout for eight years, he had "failed to achieve therapeutic goals and control of his uric acid level despite dietary restrictions."  (Tr. 745)  Dr. Jackson further found that Plaintiff had not been able to return to gainful employment for several years.  Dr. Jackson opined that Plaintiff had zero tolerance for climbing, bending, squatting, prolonged siting, or standing.

### D.    **Dr. David Volarich** (Tr. 664-87)

Dr. Volarich reported that he had reviewed Plaintiff's medical records and examined Plaintiff in order to complete an independent medical examination.  In an opinion dated April 25, 2017, Dr. Volarich opined that Plaintiff should not lift over five pounds overhead with the right upper extremity; he could handle up to fifteen pounds up close; he had limited overhead reaching and pushing and pulling with his right upper extremity; and he could not perform any repetitive handling, fingering, pushing, or pulling; and he could not be exposed to vibration.  Plaintiff indicated that he was still working part-time in a light duty job.  Plaintiff reported that when he was not having a gout flare-up, "he could perform his activities of daily living without much difficulty." (Tr. 671)  Dr. Volarich observed that Plaintiff could walk across the examination room floor without a limp, and he could toe-walk reasonably well and tandem walk without a problem. Dr. Volarich further advised Plaintiff "to pursue an appropriate stretching, strengthening, and

range of motion exercise program in addition to non-impact aerobic conditioning such as walking, biking, or swimming to tolerance daily." (Tr. 683)  Dr. Volarich further opined that Plaintiff might become permanently and totally disabled.

### E.    Vocational Rehabilitation Evaluation – Timothy Lalk (Tr. 688-707)

On August 18, 2017, Timothy Lalk, a vocational rehabilitation counselor, completed an evaluation of Plaintiff's vocational rehabilitation potential and assessed his ability to return to employment.  Mr. Lalk reported that he had reviewed Plaintiff's medical records[5] and interviewed Plaintiff.  Mr. Lalk opined that Plaintiff could not work due to his gout flare-ups causing him to miss work.  Mr. Lalk observed that Plaintiff did not appear to have any difficulty walking, standing, sitting, or changing positions.  Plaintiff reported having ten to twelve gout flare-ups each year, lasting three to five days, requiring him to miss three work days.  Plaintiff reported not being able to lift more than ten pounds and planning on calling "the employment office tomorrow." (Tr. 703)

### F.    Peak Sport & Spine (Tr. 708-20)

On May 21, 2018, Wendy Nall, a physical therapist at Peak Sport & Spine, completed a functional capacity evaluation at counsel's request.  Ms. Nall found that, based on the objective range of motion testing, Plaintiff had "impairments in his right wrist elbow and shoulder that limit his ability to grip, push, pull, and carry items n many functional planes of motion."  Ms. Nall further found that his documented impairments of his upper right extremity would "limit his ability to actively raise his arm with a load safely.  Even at 5 pounds, his lack of grip strength and fine motor coordination would pose a safety issue." (Tr. 709)

---

[5] Mr. Lalk indicated that the last treatment record from Dr. Jackson was dated August 4, 2016, even though the record shows Dr. Jackson treated Plaintiff on September 8, October 6, and November 30, 2016, and April 10, 2017.  (Tr. 642-60, 785-88)

14

IV.      **The Hearing Before the ALJ**

The ALJ conducted a hearing on August 29, 2018.  Plaintiff was present with his attorney

and testified.  (Tr. 117-57)  The VE also testified at the hearing.  (Tr. 141-51)  At the outset of the

hearing, Plaintiff's counsel noted no objections to the proposed exhibits, and specifically noted on

the record that Plaintiff was not alleging any listing.  (Tr.32-33)

A.      **Plaintiff's Testimony** (Tr. 31-53, 59-60)

Plaintiff began is testimony by noting that he lives with his wife and son.  (Tr. 122)  Plaintiff

testified that he drives his son to school every day.  Plaintiff graduated from high

school and has a Class A driver's license.  (Tr. 127-28)  Plaintiff testified that he is right-handed.

(Tr. 137)

Plaintiff testified that he last worked twice a week in May 2017, as a driver delivering

newspapers and he stopped working when the job moved to Columbia.  (Tr. 123, 125)  His job

duties included delivering bundles of newspapers weighing eight pounds.  (Tr. 128-29)  Plaintiff

injured both his wrists and elbow while working as a truck driver.  (Tr. 125-26)  Prior to that job,

he drove a charter bus.  Plaintiff also worked as a mixer for a power company, and his job duties

included mixing oils and chemicals.  (Tr. 126)  Plaintiff also testified that he worked as an over-

the-road truck driver.  (Tr. 127)

Plaintiff testified that in 2015, he injured his shoulder and wrists requiring surgical repair

and thereafter some physical therapy.  (Tr. 130)  Plaintiff returned to work but he injured his arm

requiring another surgical repair, a partial right elbow replacement by Dr. Smith.  (Tr. 130. 137)

Plaintiff testified that he experiences constant pain as a result of his injuries and taking pain

medication helps somewhat.  (Tr. 131)  Plaintiff indicated that he has problems lifting items with

his right hand and straightening his arm, and Dr. Smith had imposed an eight-pound lifting

restriction.  (Tr. 131, 137)  Plaintiff testified that he cannot pick up a gallon of water with his right hand.  (Tr. 132, 137)

Plaintiff testified that Dr. Jackson started treating him in 2010..  (Tr. 132)   Plaintiff indicated that his gout is better but when he experiences a gout attack, he is bedridden.  (Tr. 133)  Plaintiff explained that he experiences gout attacks six to ten times a year, lasting three to five days.  Plaintiff testified that he also receives medical treatment for arthritis, high blood pressure, back and knee problems, anxiety, depression, and sleep apnea.  (Tr. 135-36)

B.      **The VE's Testimony**

The VE identified Plaintiff's past work as a mixer operator, a tool mill worker, a truck driver, and over-the-road truck driver.  (Tr. 142)

The ALJ asked the VE a series of hypothetical questions to determine whether someone with Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy.  (Tr. 145-50)  First, the ALJ asked the VE to assume a hypothetical individual limited to work at the light exertional level with occasional pushing and pulling with the bilateral upper extremities and reaching and handling with the dominant right upper extremity; frequent fingering with the right upper extremity; and no exposure to concentrated vibration.  The VE responded that such hypothetical person could not perform any of Plaintiff's past work because all of the jobs were above the light exertional level.  (Tr. 145)  The VE further opined that such individual could perform jobs such as a counter clerk, a bakery inspector, and a laminator grader.  (Tr. 146)

Next, the ALJ asked the VE to identify jobs the person could perform if the hypothetical person also had additional restrictions of lifting no more than eight pounds with the dominant right upper extremity and no pushing and pulling with the right upper extremity.  The VE identified the

16

counter clerk, information clerk, and sales attendant jobs such hypothetical person could perform. (Tr. 147)  Lastly, the VE indicated that if the hypothetical person was further restricted to understand, remember and carry out simple instructions consistent with unskilled work the hypothetical persons could still perform the jobs he identified.

In response to the ALJ's question regarding unscheduled breaks, the VE indicated that a person absent from his workstation more than 15% during the workday would be precluded from competitive employment.  (Tr. 148)  The ALJ further opined that if a person is absent more than one to two days a month, competitive employment is precluded.  (Tr. 149-50)

## V.  **The ALJ's Decision**

In a decision dated December 6, 2018, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 47-63)  The ALJ determined that Plaintiff had severe impairments of post traumatic degenerative arthritis of the dominant right upper extremity with a history of a fracture to the right elbow with surgery, fracture to right wrist and right rotator cuff injury with surgery, history of bilateral carpal tunnel syndrome with surgery on the right upper extremity, gouty arthritis, osteoarthritis, and obesity.  (Tr. 54)  The ALJ determined that Plaintiff had a RFC to perform light work with the following modifications:  (1) he can lift no more than eight pounds with the dominant right upper extremity; (2) he can occasionally push and pull with the left upper extremity; (3) he cannot push and pull with the right upper extremity; (4) he can occasionally reach or handle with the dominant right upper extremity; (5) he can frequently finger with the right upper extremity; and (6) he must avoid concentrated exposure to vibration.  (Tr. 55-61)

The ALJ identified Plaintiff's past relevant work as a mixer operator, truck driver, and over-the-road trucker.  (Tr. 61)  The ALJ found, based on the VE's testimony, that there are other jobs

existing in the national economy he was able to perform the requirements of representative occupation such as a counter clerk, an information clerk, and a sales attendant.  (Tr. 62)  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.  (Tr. 63)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VI.   <u>Standard of Review and Legal Framework</u>

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …."  <u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>see also</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  <u>See</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work."  <u>Martise v. Astrue</u>, 641

F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)).

See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

      The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

      Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.     The credibility findings made by the ALJ.
2.     The claimant's vocational factors.
3.     The medical evidence from treating and consulting physicians.
4.     The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.     Any corroboration by third parties of the claimant's impairments.
6.     The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.   Analysis of Issues Presented

In his brief to this Court, Plaintiff raises two issues.  First, Plaintiff argues that the ALJ failed to consider a closed period of disability.   Second, he argues that the ALJ's RFC determination is not supported by substantial evidence.

### A.   Closed Period of Disability

Plaintiff argues that the ALJ failed to consider a closed period of disability.  Plaintiff contends that he was unable to work since July 26, 2015, but in the alternative, he seeks to be awarded a closed period of disability from July 26, 2015, through December 29, 2016, while he was recovering from each of his four surgeries on his upper right extremity.  Plaintiff cites the medical evidence of his four surgeries in support.

The Commissioner may award Social Security disability benefits either on a continuing basis, or, where a once disabling condition later ceases to be disabling, for a "closed period." Harris v. Sec'y of Dept. of Health & Human Servs., 959 F.2d 723, 724 (8th Cir. 1992) ("[D]isability is not an all-or-nothing proposition; a claimant who is not entitled to continuing benefits may well be eligible to receive benefits for a specific period of time."); see also, e.g.,

Quaite v. Barnhart, 312 F. Supp.2d 1195, 1200-01 (E.D. Mo.2004) (affirming the ALJ's decision to award disability benefits for a closed period ending on a specific date where there was substantial evidence to support the ALJ's conclusion that Plaintiff had ceased being disabled as of that date).  If evidence presented shows that a plaintiff was unable to work for at least twelve months, but recovered the ability to work before the decision on his claim is made, he may be eligible for disability benefits for the time he was unable to work.  To qualify for a closed period of disability, the disabling condition must last for at least twelve months. 42 U.S.C. § 423(d)(1)(A); Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006).

The undersigned finds Plaintiff's argument for a closed period of disability difficult to understand, because the ALJ did not deny Plaintiff's claim based on insufficient duration of an ability to engage in substantial gainful employment, but because he has the RFC to perform work. Because the ALJ properly determined Plaintiff not to be disabled at any time during the relevant period, she did not err in failing to consider a closed period of disability.  See  Clark v. Bowen, 864 F.2d 66 (8th Cir. 1988) (per curiam).  Therefore, the ALJ was not required to present a rationale for not awarding a closed period of disability when she found Plaintiff has no disabling condition.  See SSR 82-52.

Plaintiff has failed to establish he met a closed period of disability which lasted at least twelve months.  In this matter, the ALJ determined Plaintiff retained the RFC to perform light work with several limitations.  (Tr. 55)  This RFC determination must be based on medical evidence that addresses Plaintiff's ability to function in the workplace.  See Stormo v. Banrhart, 377 F.3d 801, 807 (8th Cir. 2004).  The ALJ bears the primary responsibility for making the RFC determination and for ensuring there is "some medical evidence" regarding the plaintiff's "ability to function in the workplace" that supports the RFC determination.  Lauer v. Apfel, 245 F.3d 700,

703-04 (8th Cir. 2001).  This Court is required to affirm the ALJ's RFC determination if that determination is supported by substantial evidence on the record as a whole.  See McKinney v. Apfel, 228 F.3d 860, 862 (8th Cir. 2000).  In this matter, substantial evidence supports the ALJ's RFC determination.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

Furthermore, Plaintiff never asked the ALJ to consider a closed period of disability.  See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (claimant's argument that ALJ failed to consider his morbid obesity without merit because claimant never raised the issue in the administrative process); see also Tate v. Colvin, 2015 WL 1262940, at **1, 4 (E.D. Mo. Mar. 19, 2015) (claimant appealed decision limiting her to closed period of disability to appeals council before raising issue in federal court).  Accordingly, there is no basis to find Plaintiff is entitled to a closed period of disability which lasted at least twelve months.

In sum, the record before the Court does not establish that Plaintiff's surgeries on his right upper extremity were disabling for at least twelve months during the period of July 2, 2015, to December 29, 2016, and then ceased to be disabling, such as would have suggested an entitlement to a closed period of disability.  Accordingly, the Court finds that the lack of specific discussion of a closed period of disability in the ALJ's decision does not warrant remand.

### B.    Residual Functional Capacity

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because "he cannot stand and/or walk six (6) hours per day, as required by light work, as a result of chronic gout and obesity with lower extremities edema."  (ECF No. 12 at 10)  Plaintiff further argues the medical record shows that his pain resulting from chronic gout and obesity significantly impacts his ability to stand or to walk.

According to the regulations,

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors…."

20 C.F.R. § 404.1567(b).  While "[t]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," SSR 83-10 specifically discusses the *maximum* standing and walking requirement per each exertional level of work.  SSR 83-10.  Here, the ALJ determined that Plaintiff has the capacity to perform light work but with limitations.  The ALJ determined that Plaintiff's statements about the intensity, persistence, and limiting effects of his conditions were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 56)

At the outset, the undersigned notes that, although the ALJ found Plaintiff could perform light work with limitations on his ability to lift, push, pull, reach or handle, finger, and be exposed to vibration, the ALJ's RFC finding did not address Plaintiff's ability to sit, stand, or walk six hours out of an eight-hour workday.  The Eighth Circuit considered a similar situation in which the ALJ's finding did not address Plaintiff's ability to sit, stand or walk, but included other limitations.  See Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).  Although the Eighth Circuit noted a preference that that the ALJ make specific findings as to sitting, standing, and walking, the Court determined that the ALJ had not overlooked those functions inasmuch "all of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving us some reason to believe that those functions that he omitted were those that were not limited."  Id. at 567-68.  The Court concluded that "[W]e believe that the ALJ implicitly found that Mr. Depover

23

was not limited in these functions, and in this instance, we do not see any reason to remand to make the findings explicit." Id.

In addition, several district courts within the Eighth Circuit have found no reversible error in situations similar to the one here, in which the ALJ expressed the plaintiff's RFC and/or the hypothetical question to the VE in terms of light work without setting specific functional limitations in walking, sitting, standing, pushing, pulling, but did include some other physical limitations. See Seavey v. Berryhill, 2018 WL 1317172, at *5 (E.D. Mo. Mar. 14, 2018) (finding that although the ALJ "did not specifically describe Plaintiff's ability to walk, sit, stand, push, or pull, he did include specific limitations in several other physical functions, including the ability to perform overhead work; reach or grasp; and stoop, kneel, crouch, or crawl,"); Linze v. Colvin, 2013 WL 5442766, at * 6 (E.D. Mo. Sept. 30, 2013) (rejecting the plaintiff's argument that the ALJ's hypothetical question was incomplete because it described an individual capable of performing "the full range of work."); Biggs v. Astrue, 2012 WL 3637642, at *1, *8 (W.D. Ark. Aug. 23, 2012) (rejecting the plaintiff's argument that remand was required based on a violation of SSR 96-8p where the ALJ determined that the plaintiff retained the RFC to perform "light work" but did not make specific findings with regard to sitting, standing, walking, or lifting; noting that light work is defined in the regulations and that the ALJ had made additional findings with regard to the plaintiff's limitations in areas such as climbing, stooping, bending, and crouching.); Cook v. Astrue, 629 F.Supp.2d 925, 933 (W.D. Mo. 2009) (rejecting the argument that the remand was required where the ALJ described the plaintiff's RFC in terms of "light work" without a function-by-function analysis).

A claimant's RFC is the most an individual can do despite the combined effects of his

credible limitations.  See 20 C.F.R. § 404.1545.  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)).  An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment.").  The ALJ must explain her assessment of the RFC with specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion).  Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.  20 C.F.R. §§ 404.1545(e), 416.945(e).

According to Plaintiff, the ALJ's finding that he is able to walk or stand up to six hours in a workday is not supported by substantial evidence, because the record shows his pain from chronic gout and obesity significantly limits his ability to walk and stand for six hours.[6]  However, to the extent Plaintiff identifies records that support his allegations of pain, "[i]f substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn

---

[6] The undersigned notes that Plaintiff references the medical records regarding his right arm pain which would not necessarily impact his ability to walk and stand.  The ALJ acknowledged Plaintiff's reports of pain during treatment, especially his right arm pain.

from the evidence and even if we may have reached a different outcome." McNamara, 590 F.3d at 610. Based on the records before the ALJ, the Court's review of the record shows the RFC is supported by substantial evidence, because the medical evidence establishes Plaintiff's pain from his chronic gout and obesity did not limit his ability to walk and stand as needed to perform light work.

The medical record lacks indication that Plaintiff was limited in his ability to function, and in fact, shows that his pain did not significantly affect his functional abilities, including walking and sitting. Indeed, Plaintiff's own physicians placed no sitting, standing, or walking limitations on Plaintiff due to his pain. See Hovis v. Colvin, 2016 WL 4158867, at *9 (E.D. Mo. Aug. 5, 2016) (finding it significant that no treating source indicated plaintiff was unable to work or imposed functional limitations on plaintiff's capacity to work); see also Bulford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016) (ultimate burden on claimant to establish RFC).

During treatment of November 5, 2015, Dr. Jackson encouraged Plaintiff to start a walking exercise program for at least thirty minutes each day. Plaintiff consistently reported having no gout attacks while taking Uloric during treatment with Dr. Jackson. Although Plaintiff sought treatment for his chronic gout, his condition responded to treatment and medication. On November 5, 2015, Plaintiff reported having a recent mild attack in his great right toe but the attack subsided spontaneously after a few days, and examination showed mild to moderately edematous lower extremities. During treatment on March 8, 2018, Plaintiff complained of some mild to moderate episodic gout attacks in his lower extremities. In a Second Dictation dictated for Dr. Jackson, Dr. Martin noted that Plaintiff "has had severe reaction to other gout medications in the past and is currently on Zurampic and high dose Uloric. He states that he is doing fairly well."

26

During evaluation in April 2017, Dr. Volarich observed that Plaintiff could walk across the examination room floor without a limp, and he could toe-walk reasonably well and tandem walk without a problem.  Dr. Volarich advised Plaintiff to start a range of motion exercise program in addition to non-impact aerobic conditioning such as walking.

During his vocational assessment in August 2017, Mr. Lalk observed that Plaintiff did not appear to have any difficulty walking, standing, sitting, or changing positions.

In further support, the undersigned notes that State agency physician Dr. Michael O'Day found that Plaintiff could stand or walk six hours in an eight-hour workday.  (Tr. 158-74)  Dr. O'Day opined that "[w]hile you are not capable of performing work you have done in the past, you are able to perform work that is less demanding."  (Tr. 174)

Likewise, the record shows that Plaintiff worked part time at the substantial gainful activity level during the period of his alleged disability.  Defendant is correct that such activity weighs against the Plaintiff's disability allegations.  See Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) ("Working generally demonstrates an ability to perform substantial gainful activity."); Beyer v. Berryhill, 2019 WL 555075, at *6 (E.D. Mo. Feb. 12, 2019).  In addition, Plaintiff testified that he stopped working because his employer changed locations.  Medhaug, 578 F.3d at 816-17 (leaving work for reasons other than disability.); Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998) (determination that claimant not disabled supported in part by facts that claimant (1) left job due to lay-off, not her medical condition, and (2) continued to seek work after alleged onset date.); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (claimant "worked for several years despite complaining of pain she now claims disabling, and concluded that it was the plant-closing, not her physical condition, that forced Browning out of work."); Ford v. Berryhill, 2017 WL 3503474, at *9 (E.D. Mo. Aug. 16, 2017).

27

As required by SSR 02-1p, the ALJ also considered the combined effects of Plaintiff's obesity with his other impairments "even though no treating or examining medical source has specifically attributed additional or cumulative limitations to [Plaintiff's] obesity." (Tr. 58)  Here, the ALJ found Plaintiff's obesity to be a severe impairment and his body mass index "had been at greater than Level III obesity throughout the period of alleged disability." (Tr. 59)   The ALJ specifically considered Plaintiff's obesity in determining the RFC.  While the ALJ did not explicitly indicate how Plaintiff's obesity in combination with his other impairments limited him, an ALJ is not required to include a specific discussion of obesity when, as in this case, the ALJ clearly considered the impairment and included associated limitations in her RFC determination and then properly included those physical limitations in her hypothetical to the vocational expert. Regardless, Plaintiff fails to indicate how his RFC would be different and the record does not support any additional limitations.  See McNamara, 590 F.3d at 612 (finding an ALJ's failure to include a specific discussion regarding obesity was not erroneous when neither the medical records nor the claimant's testimony demonstrated that additional limitations resulted from it); Harvey v. Berryhill, 2017 WL 3025922, at *3 (W.D. Ark. July 17, 2017) (upholding the ALJ's determination on nearly identical language).

After careful review of the record, the Court finds the ALJ's finding that Plaintiff could perform all the requirements of light work, except as indicated in her decision, is supported by substantial evidence.  That includes evidence that, between 2015 and 2018, Plaintiff had substantial periods of time without gout attacks or minor attacks resolved by his ongoing medications; that he received conservative treatment and responsiveness to treatment; and that there were inconsistencies between Plaintiff's complaints of limitations and his reported daily activities.  The ALJ specifically referred to several objective measures during the relevant time

period to explain why Plaintiff's physical condition was not disabling.   Accordingly, the Court finds that the medical evidence in the record establishes that Plaintiff is able to stand or walk up to six hours in a given eight hour workday and that his chronic gout and obesity do not cause significant functional limitation.  Therefore, the Court finds the ALJ's RFC regarding Plaintiff's ability to stand or walk to be supported by substantial evidence and by some medical evidence of Plaintiff's ability to function in the workplace.

The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from her decision.  Based on the objective medical evidence and Plaintiff's testimony and after evaluating Plaintiff's subjective symptoms, the ALJ determined that Plaintiff retained the RFC to perform light work with additional enumerated limitations/restrictions.  In any case, the ALJ is not required to list each function which she includes in the RFC followed by the specific evidence which supports a finding that the plaintiff can engage in that function.  See Davis v. Colvin, 2015 WL 1964791, at *5 (W.D. Mo. May 1, 2015) As detailed by the ALJ and throughout her decision, there was sufficient other medical evidence of record supporting the determination that Plaintiff had the RFC to perform light work with additional restrictions.  Accordingly, it cannot be said that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Because the ALJ based her RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed.  See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).  See also Goff, 421 F.3d at 789 ("An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## VIII.  **Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.  Id. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of September, 2020.

30